# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 31 2020, 9:49 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark S. Lenyo
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Termination of the Parent-Child Relationship of H.H. (Minor Child); | August 31, 2020 |
| D.M. (Father), | Court of Appeals Case No. 20A-JT-718 |
| *Appellant-Respondent,* | Appeal from the St. Joseph Probate Court |
| v. | The Honorable Ashley Mills Colburn, Magistrate |
| The Indiana Department of Child Services, | Trial Court Cause No. 71J01-1904-JT-66 |
| *Appellee-Petitioner.* | |

**Pyle, Judge.**

# Statement of the Case

D.M. ("Father") appeals the termination of the parent-child relationship with his son, H.H., ("H.H."), claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in H.H.'s removal or the reasons for placement outside Father's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to H.H.'s well-being. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.[1]

We affirm.

# Issue

> Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

The evidence and reasonable inferences that support the judgment reveals that, in September 2017, twenty-one-year-old Father pleaded guilty in federal court to being a felon in possession of a firearm. The federal trial court sentenced Father to fifteen (15) months in a federal prison. While Father was in the county jail awaiting transfer to a federal prison, H.H.'s mother ("Mother") gave

---

[1] H.H.'s mother is not a party to this appeal.

birth to H.H. in December 2017. H.H. tested positive for opioids at birth, and Mother admitted that she had used heroin throughout her pregnancy, including three days before H.H. was born. DCS removed H.H. from Mother because of her drug use and H.H.'s positive opioid test and placed him in foster care with Mother's grandmother ("Maternal Great Grandmother").

[4] DCS filed a petition alleging that H.H. was a child in need of services ("CHINS") in December 2017. The trial court adjudicated H.H. to be a CHINS in February 2018. The CHINS dispositional order required Father, who was serving his federal sentence in West Virginia, to contact DCS as soon as he was released from prison. H.H. remained in foster care with Maternal Great Grandmother.

[5] Father contacted the DCS family case manager ("the FCM") in September 2018 after he had been released from prison. The FCM arranged drug screens and supervised visitation for Father.[2] Father was offered twice weekly supervised visits with H.H. beginning in October 2018.

[6] A visitation specialist supervised Father's visits with H.H. Father attended six of twelve scheduled visits. During the visits, Father was frequently on his cell phone taking pictures and video of H.H. However, Father failed to otherwise interact with his son. Father also needed frequent reminders to check H.H.'s

---

[2] The FCM attempted to obtain the results from drug screens that Father had submitted in conjunction with his supervised release from federal prison but was unable to do so. It does not appear that DCS requested any drug screens from Father.

diaper and was not aware of what foods and beverages were appropriate for ten-month-old H.H. The visitation specialist, who described Father as "inexperienced[,]" noticed that Father "wasn't really taking to [the visitation specialist's] coaching." (Tr. Vol. 2 at 39). In November 2018, Father texted the visitation specialist that he would not be able to attend a scheduled visit and told her that he was going to speak to the FCM "about ending his supervised visitation because he wasn't comfortable seeing his son in that manner." (Tr. Vol. 2 at 40). Father never visited his son again.

[7] In December 2018, DCS filed an emergency motion for a change in H.H.'s placement after Maternal Great Grandmother had allowed Mother to have an unsupervised visit with H.H. The trial court granted DCS' motion, and DCS placed H.H. with a foster family.

[8] Between January 2019 and May 2019, the FCM attempted to contact Father but was unable to reach him. During that time, Father made no contact with DCS. In May 2019, the FCM learned that Father had been charged with two Level 6 felonies, possession of methamphetamine and possession of a narcotic drug (heroin) and was in the county jail. Father had also violated the terms of his supervised release from the federal prison. The FCM visited Father in the county jail and noticed that Father was having a difficult time sitting still and focusing. Father admitted that he was detoxing from heroin.

[9] In June 2019, DCS filed a petition to terminate Father's parental relationship with H.H. In July 2019, Father pled guilty to the two felony drug charges and

was sentenced to twelve (12) months in the county jail. In addition, the federal court sentenced Father to ten (10) months for violating the terms of his supervised release. Father was ordered to serve the ten-month federal sentence after he completed the twelve-month sentence in the county jail.

[10] Father participated in the December 2019 termination hearing "via video conference" because he was incarcerated. (Tr. Vol. 2 at 3). Father did not testify at the hearing.

[11] During the hearing, when DCS asked the FCM whether she believed that "[F]ather had been able to remedy the reasons that [had] lead to [H.H.]'s continued placement outside of his home," the FCM responded as follows:

> [Father] unfortunately has spent the majority of this case incarcerated, not for one, but for multiple criminal instances. And the time he did have outside of incarceration, he spent very little time using that time to bond and gain a relationship with his son. And, in fact, he chose to stop visiting his son on his own accord.

(Tr. Vol. 2 at 65).

[12] The court-appointed special advocate ("the CASA") also testified at the termination hearing. According to the CASA, H.H. was bonded to his foster parent and was "flourishing" in foster care. (Tr. Vol. 2 at 55). The CASA testified that H.H. had recently had ear tubes placed in his ears and his communication skills were "getting stronger." (Tr. Vol. 2 at 55). When asked why she believed that a termination of Father's parental rights was in H.H.'s

best interests, the CASA responded that Father had "chose[n], on his own, to stop seeing [H.H.], and [H.H.] deserve[d] a sober, stable, loving home, and through adoption, that c[ould] be achieved." (Tr. Vol. 2 at 55). The plan for H.H. was foster parent adoption.

[13] Following the hearing, the trial court issued a detailed order terminating Father's parental relationship with H.H. Father appeals.

# Decision

[14] Father argues that there is insufficient evidence to support the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[15] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining

whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[16] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

Here, Father argues that there is insufficient evidence to support the termination of his parental rights. Specifically, he contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in H.H.'s removal or the reasons for placement outside

the parent's home will not be remedied; and (2) a continuation of the parent-child relationships poses a threat to H.H.'s well-being.

[17] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.*, 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in H.H.'s removal or the reasons for his placement outside the home will not be remedied.

[18] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.3d 1150, 1157 (Ind. Ct. App. 2013). The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be

remedied. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *E.M.*, 4 N.E.3d at 643.

[19] Here, our review of the evidence reveals that H.H. was removed from Mother at birth because of his positive opioid test and Mother's drug use. When H.H. was born, Father was in the county jail awaiting transportation to a federal prison in West Virginia. After Father had been discharged from the federal prison, he contacted the FCM, who offered him drug screens and supervised visitation with H.H. Father attended only six of twelve scheduled visits with H.H. and then decided to stop attending the visits because he did not want to visit with his son in a supervised setting. DCS was then unable to reach Father for four months until the FCM learned that Father was in the county jail, having been charged with two drug-related felonies. When the FCM visited Father in the county jail, Father was detoxing from heroin. Father subsequently pled guilty to the two drug-related felonies and was sentenced to twelve months in the county jail. The federal court also sentenced Father to a ten-month sentence for violating his federal supervised release and ordered Father to serve that sentence after he had served the twelve-month sentence. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in H.H.'s removal would not be remedied. There is sufficient evidence to support the termination of Father's parental rights.

Affirmed.

Kirsch, J., and Tavitas, J., concur.